**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

LINDA GOETZ,                                        CASE NO.: 11-cv-270

          Plaintiff,                              Judge Michael R. Barrett

    v.

CITY OF FOREST PARK,

          Defendant.

## <u>OPINION AND ORDER</u>

This matter is before the Court on the Motion for Summary Judgment on Behalf of Defendant, City of Forest Park.  (Doc. 12).  Plaintiff Linda Goetz has filed her opposition (Doc. 20), and Defendant has filed its reply (Doc. 23).  This matter is now ripe for review.

## I.   <u>BACKGROUND</u>

The facts are construed in favor of Plaintiff as follows:

Plaintiff Linda Goetz is a Caucasian female.  (Doc. 13, p. 61).  On December 1, 2005, Plaintiff began working for Defendant City of Forest Park Fire Department as a part-time firefighter/EMT.  (Doc. 13, p. 24).  Approximately two years later, in or about January 2007, Plaintiff received Defendant's Standard Operating Guideline ("SOG") manual.  (Doc. 12-1, p. 1; Doc. 13, pp. 28-29).  S.O.G. #603(5)(J) of the SOG manual provides: "Tattoos may be required to be covered at the discretion of the Fire Chief." (Doc. 12-2, p. 131).  S.O.G. #701(7) of the SOG manual further provides:

**7.  Insubordination**

1

> **A**. Failure or deliberate refusal of a Chief Officer, Fire Captain, Fire Lieutenant, or Firefighter to obey a lawful order given by a superior shall be considered an act of insubordination.
>
> **B**. Persons in doubt as to the nature or detail or an order or assignment shall request an explanation to avoid unintentional insubordination.
>
> **C**. Insubordination shall result in strict disciplinary actions as provided in department standard operating guidelines.

(Doc. 12-3, pp. 132-33). Plaintiff's signature appears on the form "Standard Operating Guideline Acceptance," which is dated January 10, 2007 and which reads "I, Linda Goetz, have received the City of Forest Park Fire Department SOG manual dated October 2006 and agree to read and abide with its provisions." (Doc. 12-1; Doc. 13, pp. 28-29). Plaintiff never read all of the provisions of the SOG manual. (Doc. 13, pp. 31-32, 41). Prior to January 5, 2010, she was unaware that Defendant had a tattoo policy. (Doc. 13, pp. 40-41; Doc. 20-1, ¶ 4). She alleges that she had been unaware of the tattoo policy because it had not previously been enforced. (Doc. 20-1, ¶ 4).

It is estimated that approximately fifty percent of the firefighters working for Defendant have tattoos. (Doc. 17, p. 10). In December 2009, Plaintiff obtained a dragonfly tattoo on the left side of her neck, and on or about January 1, 2010, Plaintiff obtained a dandelion tattoo on the right side of her neck as well as a cross on the inner side of her left bicep. (Doc. 13, pp. 46-48, 50-52; Doc. 20-1, ¶ 4).

On or about January 14, 2010, Plaintiff was removed from a training session by her Lieutenant, Kevin Martin, and her Captain, Thomas Jackson, who informed her that she had to cover her tattoos by order of the Fire Chief, Trish Brooks. (Doc. 13, pp. 52-54). Plaintiff responded by covering up her tattoos with gauze. (Doc. 13, pp. 54-55, 58). Later that same day, Plaintiff received an email from her Lieutenant following up on

2

the conversation concerning the tattoo policy and advising Plaintiff that she was to cover up her tattoos at all times while on duty per the order of Fire Chief Brooks.  (Doc. 13, pp. 56-59; Doc. 12-1).

Sometime between January 14, 2010 and April 2010, Plaintiff was informed by Captain Jackson that she could leave the tattoos exposed when Fire Chief Brooks was not present.  (Doc. 13, pp. 55-58).  Plaintiff continued to cover up her neck tattoos by wearing turtlenecks and covering her arm tattoo as well.  (Doc. 13, pp. 55, 58-59).  Plaintiff, however, did not understand why other co-workers did not have to cover their tattoos while at work.  (Doc. 13, p. 59).  In the following months of 2010, Plaintiff obtained two additional tattoos, which included Indian feathers on her right foot and a lightning bolt on the upper inner portion of her right forearm.  (Doc. 13, pp. 52-53).

On April 26, 2010, Captain Jackson told Plaintiff to cover her tattoos while Fire Chief Brooks was around.  (Doc. 13, pp. 69-70).  Later that evening during Plaintiff's performance evaluation, Captain Jackson asked Plaintiff if she was going to cover her tattoos, to which Plaintiff responded "I don't know" because she was puzzled as to why she was being asked to do so when Fire Chief Brooks was not around and she had not been required to cover her tattoos prior to that time in the absence of Fire Chief Brooks.  (Doc. 13, pp. 69-77, 83-84; Doc. 14, pp. 18-20).  Plaintiff does not recall if her tattoos were covered at that time and does not recall being directly ordered to cover up her tattoos that evening.  (Doc. 13, pp. 77, 80, 83).  Captain Jackson's question was a continuation of the order that Fire Chief Brooks had imposed in January 2010.  (Doc. 13, pp. 79-80; Doc. 14, p. 19).  Plaintiff was issued a written reprimand for insubordination, willful disobedience and violation of the tattoo policy, which Plaintiff

3

refused to sign. (Doc. 12-5; Doc. 13, pp. 77-78). Plaintiff was sent home on administrative leave and a pre-disciplinary hearing was set for her. (Doc. 13, p. 86; Doc. 17, pp. 13-14). That was the only reprimand Plaintiff had received in seven years of employment with Defendant. (Doc. 13, p. 78).

After Plaintiff was sent home on paid administrative leave, Captain Jackson sent an email to his superiors, copying Plaintiff, summarizing the events that had transpired. (Doc. 12-6). A disciplinary process was completed regarding the written reprimand, and Plaintiff was issued a 24-hour disciplinary lay off without pay. (Doc. 12-7; Doc. 13, pp. 88, 171). Shortly thereafter, the Assistant Fire Chief, Michael Rupp, emailed the entire Forest Park Fire Department stating that "all tattoos must be covered at all times during work hours." (Doc. 12-8; Doc. 13, pp. 90-91).

On or about May 5, 2010, Plaintiff filed a grievance relating to her discipline. (Doc. 13-2, Ex. 17). In that grievance, Plaintiff claimed she was discriminated against based on her race, color and sex in regards to her discipline for failing to cover her tattoo. (Doc. 13-2, Ex. 17). Plaintiff claimed that she had no knowledge of any other co-workers being told or ordered to cover up their tattoos. (Doc. 13, pp. 61-63, 168-70; Doc. 13-2, Ex. 17). Responding to Plaintiff's grievance, Fire Chief Brooks wrote a memorandum dated May 14, 2010, which stated:

> The City of Forest Park Fire Department denies your grievance. You received a written reprimand and 24-hour disciplinary layoff because you repeatedly disregarded instructions from your superior officers directing you to cover your neck tattoos pursuant to department policy. The cause of your suspension was insubordination, not discrimination.
>
> As you are aware, S.O.G. 603.5.J. states that "[t]attoos may be required to be covered at the discretion of the Fire Chief." The Fire Department has a legitimate interest in promoting a positive work environment, presenting a professional, uniform and identifiable

4

appearance to the public, as well as avoiding workplace distractions. It is well-established that local governments may establish appearance codes – including requiring employees to cover visible tattoos in order to serve these interests.

. . . .

While you assert that you are the only employee who has ever been asked to cover a visible tattoo, that is incorrect. Firefighter Breyer, a white male, has a prominent tattoo on his lower calfs [sic]. Because the tattoo is visible when Mr. Breyer wears shorts, he has been asked to wear long pants even during the summer months. Mr. Breyer has complied with this request.

You also assert that the City has enforced the regulations governing tattoos in a discriminatory fashion because your co-worker, Melody Meadows, has a tattoo on her neck and has not been asked to cover it up. Ms. Meadows' tattoo is far less conspicuous and noticeable than yours. As a result, it is far less likely to negatively impact the professionalism and uniformity of the Fire Department. In addition, Ms. Meadows often covers up her tattoo with makeup when she is required to deal with members of the public.

While the Fire Department believes it has uniformly enforced the tattoo regulation, it has recently taken steps to ensure consistent enforcement. Accordingly, while you were away on training, the Fire Department issued a memorandum stating that, in the future, ALL visible tattoos must be covered up.

(Doc. 13-2, Ex. 19).

In this litigation, Assistant Fire Chief Rupp and Chief Alfonzo Jones testified that they did not discipline anyone in relation to their tattoos prior to when Plaintiff was disciplined. (Doc. 16, p. 20; Doc. 17, p. 10). Assistant Fire Chief Rupp and Chief Jackson, however, both testified that Tom Breyer, a white male full-time firefighter/EMT with Defendant, was ordered to cover up his tattoos on each of his calves while on-duty prior to when Plaintiff was ordered to cover up her neck tattoos in 2010. (Doc. 14, pp. 23-24; Doc. 17, p. 19) Tom Breyer also submitted an affidavit indicating that he is an Asian Caucasian male who, prior to 2010, was issued a standing order by Fire Chief

5

Brooks to cover the tattoos on his calves. (Doc. 12-9, ¶¶ 1-3). Mr. Breyer claims that he complied with that order and continued to comply with that order during his tenure with Defendant. (Doc. 12-9, ¶¶ 3-4). Assistant Fire Chief Rupp also testified that Mr. Breyer complied with that order. (Doc. 17, pp. 23-24). Plaintiff, however, testified that Mr. Breyer was seen wearing shorts on duty after being ordered to cover his tattoos by wearing long pants. (Doc. 13, pp. 62-63, 158).

Melody Meadows, a co-worker of Plaintiff's, submitted an affidavit indicating that Fire Chief Brooks first noticed her neck tattoo consisting of two cherries, which are each the size of a quarter, prior to 2010. (Doc. 12-10, ¶ 4). She told Fire Chief Brooks of her "conscious and concerted efforts to keep [her] neck tattoo covered while on-duty" and Fire Chief Brooks informed her "that it was a good idea to keep it covered while [she] was on-duty as a Forest Park firefighter/paramedic." (Doc. 12-10, ¶ 5). Following that conversation, she continued to make conscious and concerted efforts to "always have [her] 'cherries' neck tattoo covered while on-duty as a Forest Park firefighter/paramedic" and used a variety of methods to do so. (Doc. 12-10, ¶ 7). However, Captain Amos Johnson testified that he saw Ms. Meadows' tattoo exposed during work hours prior to May 2010 when the department-wide email regarding covering tattoos was sent. (Doc. 15, pp. 19-20).

Plaintiff took and/or obtained some pictures of her co-workers that allegedly show her co-workers with their tattoos exposed. (Doc. 13-1, Exs. 36-47; Doc. 20-2, pp. 1-25). In three of the photographs, the tattoos are not visible but Plaintiff testified that in each one her co-worker was not covering his or her tattoo. (Doc. 13, pp. 156-59). Although Plaintiff did not know when those photographs were taken, she claims at least two of

those three photographs were taken at a time when she claims to have been wearing a turtleneck to cover her tattoos and that one was after her tattoo incident. (Doc. 13, pp. 156-59) A fourth photograph was taken of a co-worker with a neck tattoo, but it is unclear whether he was on duty in the picture. (Doc. 13, pp. 159-60). A fifth photograph was taken of Ms. Meadows after work that allegedly shows a tattoo. (Doc. 13, pp. 160-61). A sixth photograph was taken of Ms. Meadows during work hours that allegedly shows a visible tattoo on her neck. (Doc. 13, pp. 161-62). A seventh photograph was taken by Plaintiff of another co-worker, Ryan Haines, at a PR detail at a church that Plaintiff believes was taken after her April 2010 tattoo incident. (Doc. 13, pp. 162-63). An eighth photograph taken by Plaintiff is alleged to depict a tattoo of another co-worker, Jim Klems, but Plaintiff did not recall the date the picture was taken. (Doc. 13, pp. 163-64). A ninth picture allegedly shows several co-workers at the physical agility test day where Plaintiff got heat exhaustion from wearing a turtleneck to cover her tattoos, but it is unclear whether any of those co-workers have tattoos. (Doc. 13, pp.164-66). Several other pictures also purportedly show co-workers with tattoos exposed, although the dates of those pictures is unclear. (Doc. 13, pp. 166-68; Doc. 20-2).

Based on these facts, Plaintiff brings claims for race and sex discrimination in violation of Title VII and Ohio Revised Code § 4112. (*See* Doc. 1). Defendant moves for summary judgment on all of Plaintiff's claims. (Doc. 12).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution affects the outcome of the suit.  *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.  *Anderson*, 477 U.S. at 248-49.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## III.  ANALYSIS

Plaintiff alleges that Defendant unlawfully discriminated against her based on race and sex pursuant to Title VII and Ohio Revised Code § 4112.  (Doc. 1).  The Ohio Supreme Court has held that federal caselaw interpreting Title VII is equally applicable to discrimination claims brought under Ohio law.  *Staunch v. Cont'l Airlines, Inc.*, 511

F.3d 625, 631 (6th Cir. 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Com.*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (Ohio 1981)).  Therefore, the following summary judgment analysis applies to both the Title VII and Ohio claims.  *See id.*

In a case involving alleged discrimination on the basis of race and sex, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive.  *Rallins v. Ohio State Univ.*, 191 F. Supp. 2d 920, 928 (S.D. Ohio 2002) (citing *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348-49 (6th Cir. 1997)).  Here, Plaintiff claims she has direct and circumstantial evidence of such discrimination.  Both arguments are analyzed below.

A.     **Direct Evidence**

"In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Direct evidence of discrimination is evidence that does not require the factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.  *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).  "Once there is credible direct evidence, the burden of persuasion shifts to the defendant to show that it would have [engaged in the same disciplinary conduct] had it not been motivated by discrimination."  *Jacklyn*, 176 F.3d at 926.

With respect to her race discrimination claim, Plaintiff alleges that Fire Chief Brooks' May 14, 2010 Memorandum stands as direct evidence of race discrimination. (Doc. 20, pp. 6-7). Plaintiff argues that Fire Chief Brooks "readily admits that the motivating factor for ordering Goetz to cover her tattoos is her race." (Doc. 20, p. 7). Plaintiff appears to rely on the portion of the memorandum which states, "Ms. Meadows['] tattoo is far less conspicuous and noticeable than yours." (Doc. 20, pp. 6-7).[1]

The statement made in the May 14, 2010 Memorandum does not constitute direct evidence of discrimination. The statement does not mention race or clearly demonstrate any racial animus. To conclude that Fire Chief Brooks had a racial animus in making that statement, the Court must infer that Fire Chief Brooks believed Ms. Meadows' tattoo was less conspicuous than Plaintiff's because Ms. Meadows is African American while Plaintiff is white. However, it would also be a logical inference that Fire Chief Brooks believed Ms. Meadows' tattoo was less conspicuous than Plaintiff's because Ms. Meadows' tattoo was smaller or in an area that was less noticeable under her uniform. Moreover, the statement was not written in conjunction with Plaintiff's discipline, but instead was written in response to the grievance filed by Plaintiff alleging discrimination based on race and sex. As such, it would be logical that Fire Chief Brooks would respond with information about consistent enforcement across all racial groups with a reference to the race of individuals against whom the policy had been enforced. To find racial animus, the Court would have to infer such animus from the

---

[1] Although Plaintiff also states that Fire Chief Brooks informed Plaintiff of her reasoning for ordering her to cover her tattoo (Doc. 20, p. 7), Plaintiff has not submitted any deposition testimony, affidavit, or other evidence that indicates Fire Chief Brooks directly told Plaintiff her reason for disciplining her was her race or sex.

facts in the case.  Given that an inference is required to find racial animus, the Court cannot find the memorandum to be direct evidence of discrimination.

With respect to her sex discrimination claim, Plaintiff does not appear to allege that she has direct evidence of sex discrimination.  Indeed, Plaintiff testified to the following about being required to cover her tattoos:

> Q:     No one ever specifically told you, hey, we're making you cover your tattoo up because you're a female, did they?
>
> A:     No.

(Doc. 13, pp. 179-80).

Accordingly, Plaintiff has failed to establish that there is direct evidence of her race or sex discrimination claim.  Defendant is entitled to summary judgment as to the existence of direct evidence of race and sex discrimination.

### B.     Circumstantial Evidence

Although Plaintiff has not produced direct evidence of discrimination based on race or sex, she still may prove that she was discriminated against based upon her race or sex through indirect circumstantial evidence.   When a plaintiff seeks to establish her case indirectly, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.   Under *McDonnell Douglas*, a plaintiff has the burden of proving a *prima facie* case of discrimination.  To do so, a plaintiff must show that: (1) she was a member of a protected class, or in the case of reverse discrimination, background circumstances that show the defendant is one of the unusual employers who discriminates against the majority; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated employees of a different race or sex. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th

Cir. 2004); *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012). The burden of establishing a *prima facie* case is not intended to be an onerous one. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 870 (6th Cir. 2001).

If a *prima facie* case can be shown, then the burden shifts to the defendant to prove a legitimate, nondiscriminatory basis for the termination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). If the defendant carries this burden, then the plaintiff must show that the legitimate, nondiscriminatory basis is, in fact, only a pretext to hide the discrimination. *McDonnell Douglas*, 411 U.S. at 802.

Plaintiff and Defendant dispute whether (1) Plaintiff has proven the fourth element of her *prima facie* case for both her race and sex discrimination claims, and (2) whether Defendant's proffered legitimate non-discriminatory reason for its actions was pretextual. (Doc. 12, pp. 9-12; Doc. 20, pp. 9-10).

### 1.    *Prima Facie* Case

To satisfy her burden on the fourth prong of the *prima facie* case, Plaintiff must prove that she was treated differently than similarly-situated employees who were of a different race or sex. *DiCarlo*, 358 F.3d at 415. With respect to her race discrimination claim, Plaintiff claims she was treated differently than non-white firefighters, and specifically points to her African American female co-worker, Ms. Meadows, who Plaintiff contends was never subject to an order to cover her tattoos and was never disciplined for having her tattoos exposed. (Doc. 20, p. 9). With respect to her sex discrimination claim, Plaintiff contends that she was treated differently than her male counterparts, and points specifically to her white male co-worker, Mr. Breyer, who was

advised to wear pants to cover his tattoos but who was not disciplined when he failed to cover them. (Doc. 20, p. 9).

In response, Defendant contends that no similarly situated persons were treated more favorably than Plaintiff because Plaintiff's discipline was based on her refusal to obey an order given to her by Captain Jackson to cover her tattoos. (Doc. 12, p. 10). Defendant also argues that Ms. Meadows was told to cover her neck tattoos, which she did, and that Mr. Breyer was ordered to cover tattoos while on-duty prior to Fire Chief Brooks ordering Plaintiff to cover up her neck tattoos in 2010, which he did. (Doc. 12, pp. 10-11). Defendant claims that the fact that these individuals also were told to cover their tattoos demonstrates that Plaintiff has failed to establish the fourth prong of the *prima facie* case. (Doc. 12, pp. 9-11). Further, according to Defendant, the pictures that Plaintiff relies upon to demonstrate that other co-workers exposed their tattoos do not save her claims because they are undated, and do not show tattoos exposed except in a couple circumstances where the individual was off-duty. (Doc. 23, pp. 8-10).

For the reasons explained below, the Court concludes that Plaintiff has satisfied her "not onerous" burden of proving a *prima facie* case of race discrimination and sex discrimination.

The first issue to address is whether Plaintiff has presented a genuine issue of material fact as to whether she was treated differently than her non-white co-workers. She alleges that she was treated differently in two ways: (1) by being ordered to cover her tattoos; and (2) by being disciplined for failing to do so.

With respect to being ordered to cover tattoos, Plaintiff has demonstrated a genuine issue of material fact as to whether she was treated differently than her non-

white co-worker.  Ms. Meadows' affidavit indicates that she had a conversation with Fire Chief Brooks regarding covering her neck tattoo during which Fire Chief Brooks advised that she keep it covered while on duty, and that conversation occurred prior to 2010. (Doc. 12-10, ¶¶ 4-5).  However, the May 14, 2010 Memorandum from Fire Chief Brooks suggests that Ms. Meadows was not asked to cover her tattoo for various reasons, including that her tattoo was less conspicuous than Plaintiff's and she covered her tattoo with makeup.  (Doc. 13-2, Ex. 19).  Based on the information presented to the Court, there is a genuine issue of material fact as to whether Ms. Meadows was subject to an order, and if not, whether the reasons for not subjecting Ms. Meadows to an order are based in whole or in part on race.  Although the Court finds it notable that there is only one non-white comparator and that Plaintiff's male comparators, who are white, were in fact ordered to cover tattoos while on duty (*see* Doc. 12-9, ¶ 3; Doc. 13-2, Ex. 19), it finds that evidence, when combined with the other evidence, presents a genuine issue of material fact to be resolved by the factfinder.

As for enforcement of any order to cover tattoos and being disciplined for failing to cover tattoos, Plaintiff also has demonstrated a genuine issue of material fact as to whether she was treated differently than her non-white comparator.  Ms. Meadows has submitted an affidavit that indicates she complied with Fire Chief Brook's request to cover her tattoos (Doc. 12-10); however, Captain Johnson testified that he saw Ms. Meadows' tattoo exposed during work hours prior to May 2010 and Plaintiff likewise has testified that Ms. Meadows has her tattoo exposed during work hours (Doc. 15, pp. 19-20).  There is no indication that Ms. Meadows was ever again ordered to cover her

tattoos or disciplined for having her tattoos exposed, and Ms. Meadows' affidavit suggests she was not. (*See* Doc. 12-10).

There also is a genuine issue of material fact as to whether Plaintiff and Ms. Meadows are similarly situated in regards to their conduct. In establishing that two people are similarly situated, a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation omitted). *Accord*: *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 709-10 (6th Cir. 2006). Instead, "the plaintiff [must] demonstrate that he or she is similarly situated to the [claimed comparator] in all relevant respects." *Wright*, 455 F.3d at 710 (quoting *Ercegovich*, 154 F.3d at 353). In the disciplinary context, the Sixth Circuit has held that to be found similarly situated, "the plaintiff and [her] proposed comparator must have engaged in acts of 'comparable seriousness.'" *Id.* (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)); *see also Macy v. Hopkins County School Bd. of Educ.*, 484 F.3d 357, 370 (6th Cir. 2007) (explaining that where incidents of misconduct giving rise to discipline form the crux of the similarities between employees, the degree of their misconduct is a factor to be given great weight). To make this assessment, a court must look "to certain factors, such as whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Wright*, 455 F.3d at 710 (quoting *Ercegovich*, 154 F.3d at 352).

Construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented a genuine issue of material fact as to whether her and Ms. Meadows engaged in conduct of "comparable seriousness."   Plaintiff testified that she informed Captain Jackson, her superior, that she did not know if she would cover her tattoos as she had previously been ordered to do by Fire Chief Brooks.  (Doc. 13, pp. 70-77).  She also testified, however, she did not believe Captain Jackson ordered her to cover her tattoos on the day she was disciplined and she does not recall whether her tattoos were covered at that time.  (Doc. 13, pp. 77, 80, 83).  As for Ms. Meadows, Plaintiff has presented no evidence to this Court that would suggest that she directly informed a supervisor that she may not cover her tattoos even if requested to do so, but there is some evidence before the Court that suggests that Ms. Meadows did not cover her tattoos while on duty and even in front of supervisors even after being ordered to do so (Doc. 12-10; Doc. 15, pp. 19-20).  Pursuant to S.O.G. #701(7), a firefighter may be disciplined for insubordination for either a "[f]ailure" or a "deliberate refusal" to obey a lawful order given by a superior.  (Doc. 12-3, pp. 132-33).  Based on that language of the policy, a direct refusal to cover tattoos after an order to do so may warrant the same treatment as a simple failure to cover tattoos after being ordered to do so.  (Doc. 12-3, pp. 132-33).  As such, the Court cannot conclude on summary judgment that Plaintiff's conduct was so different or more egregious than Ms. Meadows' alleged conduct so as to constitute such differentiating or mitigating circumstances that conclusively distinguish the conduct or the employer's treatment of the employees for it.  *See Clayton*, 281 F.3d at 612 (granting summary judgment on the *prima facie* case where the undisputed facts demonstrated that the plaintiff's infraction was sufficiently more

16

egregious than that of his comparators to warrant more severe treatment).  As such, Plaintiff has met her burden of establishing a *prima facie* case of race discrimination.

The second issue to address is whether Plaintiff has presented a genuine issue of material fact as to whether she was treated differently than her male comparators. She alleges that she was treated differently in two ways:  (1) by being ordered to cover her tattoos; and (2) by being disciplined for failing to do so.

With respect to being ordered to cover tattoos, Plaintiff has not demonstrated a genuine issue of material fact as to whether she was treated differently because of her sex.  Although Plaintiff argues that none of her other male co-workers were told to cover their tattoos, she does not support that argument in her opposition with any evidence. The evidence presented to the Court demonstrates that her male comparators were ordered to cover their tattoos.  (Doc. 12-9, ¶ 3; Doc. 13-2, Ex. 19; Doc. 14, pp. 143-15, 23-24; Doc. 17, p. 19).  Specifically, the one male comparator relied on by Plaintiff is Mr. Breyer.  His affidavit, the May 14, 2010 Memorandum from Fire Chief Brooks, and the testimony of Assistant Fire Chief Rupp and Chief Jackson confirm that Mr. Breyer was ordered to cover his tattoos prior to the time Plaintiff was required to do so.  (Doc. 12-9, ¶ 3; Doc. 13-2, Ex. 19; Doc. 14, pp. 23-24; Doc. 17, p. 19).  While it is possible that some male comparators were not ordered to cover them, Plaintiff has not presented that evidence to the Court, and in any event, there is sufficient evidence to show that male comparators were being ordered to cover their tattoos such that Plaintiff was not treated differently in that regard.  Moreover, whether Mr. Breyer or other males complied with the order to cover their tattoos is relevant to whether Plaintiff was treated differently with respect to enforcement and discipline, but not with respect to the initial order.  As such,

17

Plaintiff has not demonstrated that she was treated differently based on her sex on the basis of being ordered to cover her tattoos under S.O.G. #603(5)(J).

As for enforcement of any order to cover tattoos and being disciplined for failing to cover tattoos, Plaintiff has demonstrated a genuine issue of material fact as to whether she was treated differently than her male comparators. Although Mr. Breyer has submitted an affidavit that indicates he covered his tattoos during work hours (Doc. 12-9), Plaintiff has testified that Mr. Breyer did not always do so (Doc. 13, pp. 62-63, 158). Although the pictures upon which Plaintiff relies are unclear and insufficient for the Court to rely upon to determine whether such tattoos were exposed during work hours and during a relevant time period, the conflicting testimony explained above nevertheless raises a genuine issue of material fact regarding credibility of the witnesses that cannot be resolved by the Court on summary judgment.

There also is a genuine issue of material fact as to whether Plaintiff and her male comparator are similarly situated in regards to their conduct. The same standard used for evaluating this issue with respect to racial discrimination is applicable here as to sex discrimination. Construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented a genuine issue of material fact as to whether her and her male comparator engaged in conduct of "comparable seriousness." Again, Plaintiff testified that she informed Captain Jackson, her superior, that she did not know if she would cover her tattoos as she had previously been ordered to do by Fire Chief Brooks. (Doc. 13, pp. 70-77). She also testified, however, that she does not believe Captain Jackson ordered her to cover her tattoos and she does not recall whether her tattoos were covered at that time. (Doc. 13, pp. 77, 80, 83). As for Mr. Breyer, Plaintiff has

presented no evidence to this Court that would suggest that he, or any other male comparator, directly informed a superior that he may not cover his tattoos even if requested to do so, but she has presented some evidence that suggests that Mr. Breyer disobeyed an order by not covering his tattoos while on duty after being ordered to do so (Doc. 13, pp. 62-63, 158).  Although the Court again recognizes there are some distinctions between their conduct and that the dispute turns on an issue of credibility, it again finds that in light of S.O.G. #701(7), the differences are not so substantial or so egregious that it must conclude on summary judgment that there are such differentiating or mitigating circumstances that conclusively distinguish the conduct or the employer's treatment of them for it.  *See Clayton*, 281 F.3d at 612.  As such, Plaintiff has met her burden of establishing a *prima facie* case of sex discrimination.

### 2.    **Pretext**

As Plaintiff has satisfied her burden of proving a *prima facie* case of race and sex discrimination, Defendant must articulate a legitimate, non-discriminatory reason for its action.    Defendant has stated that its legitimate, non-discriminatory reason for disciplining Plaintiff was that she failed to obey the order of Captain Jackson and failed to take steps to avoid any disciplinary conduct.  (Doc. 12, p. 12).  Having articulated some legitimate, non-discriminatory reasons for its action, Defendant has satisfied its burden and Plaintiff must now show that Defendant's articulated reason for disciplining her was a pretext for discrimination.

Plaintiff may prove pretext by showing that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action.  *Manzer v. Diamond*

*Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Regardless of which option is chosen, Plaintiff must produce "'sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendants intentionally discriminated against him.'" *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (alteration in original) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001); *see also Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009). A satisfactory showing that similarly situated employees, who do not belong to the same class as Plaintiff, were treated differently with regard to violation of a work rule can lend support to Plaintiff's pretext argument. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997); *see also Johnson*, 319 F.3d at 867 (considering evidence of how similarly-situated employees were treated when determining whether the plaintiff had satisfied his burden of proving pretext); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (plaintiff can prove pretext under the third *Manzer* prong by demonstrating that he was treated differently than similarly situated employees). As "an employer's true motivations are particularly difficult to ascertain" from the paper record, discrimination disputes are often "unsuitable for disposition at the summary judgment stage" once the plaintiff has made out a *prima facie* case. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004).

Plaintiff does not argue that the proffered reason had no basis in fact or that the proffered reason was insufficient to motivate the adverse action; rather, she argues that the proffered reason did not actually motivate the adverse action, as demonstrated by Plaintiff being subjected to discipline for not covering her tattoos when none of her other co-workers were subject to any discipline for not covering their tattoos. (Doc. 20, pp. 9-

20

11).  Defendant counters that Plaintiff has failed to prove pretext because it is undisputed that had Plaintiff obeyed the order given to her to cover her tattoos while on duty, the written reprimand would not have occurred.  (Doc. 12, p. 13; Doc. 23, p. 13). Defendant further cites to the testimony of Captain Jackson that Mr. Breyer was not disciplined because he covered his tattoos when he was asked to do so and to Ms. Meadows' affidavit that she would have complied with such a request if she was asked or ordered to cover up her tattoos.  (Doc. 23, p. 14) (citing Doc. 14, p. 29; Doc. 12-10, ¶ 8).

This is admittedly a close case.  However, the Court is of the opinion that Plaintiff has presented sufficient evidence to enable a reasonable jury to conclude that Defendant's proffered reason for disciplining Plaintiff was pretextual. Plaintiff raises, albeit inartfully, a question as to the consistency of Defendant's enforcement of the tattoo policy and the discipline.  When the evidence presented is construed in favor of Plaintiff, it suggests that Plaintiff was one of only a few firefighters who were ordered to cover tattoos, and one of those firefighters who may not have been ordered to cover tattoos that were in a location similar to Plaintiff's tattoos is an African American female. (Doc. 12-9, ¶ 3; Doc. 13-2, Ex. 19; Doc. 14, pp. 143-15, 23-24; Doc. 17, pp. 10, 19). Even if those co-workers were told to cover their tattoos, the evidence still suggests that at least one African American female and one male co-worker continued to expose their tattoos while on duty in contradiction to their superior's order, but, unlike Plaintiff, were not disciplined for their conduct.  (Doc. 12-10; Doc. 13, pp. 62-63, 158; Doc. 15, pp. 19-20).  The evidence also suggests that Plaintiff was the only employee who has ever been disciplined for failing to cover her tattoos.  (*See* Doc. 17, p. 10).  Pursuant to

S.O.G. #701(7), both a "failure" and a "deliberate refusal" to obey a lawful order of a superior is subject to discipline for insubordination.  (Doc. 12-3).  Since some evidence suggests that the comparators' alleged conduct could be a "failure" to obey or a "deliberate refusal" to obey, there is a question of fact as to whether the co-workers should have been disciplined under S.O.G. #701(7), and if so, why they were not disciplined while Plaintiff was disciplined.  Much of that determination will turn on the credibility of the witnesses.  Therefore, in the Court's judgment, a reasonable jury could find such a discrepancy in the enforcement of the policy to be indicative of pretext. Accordingly, Plaintiff has produced sufficient evidence at this stage of the litigation to satisfy her burden as to pretext.

## IV.    CONCLUSION

Based on the foregoing, Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART.**  Specifically, it is ORDERED that:

1. Partial summary judgment is GRANTED to Defendant as to direct evidence of race and sex discrimination;

2.  Partial summary judgment is GRANTED to Defendant on Plaintiff's claim of sex discrimination based on orders to cover tattoos pursuant to S.O.G. #603(5(J); and

3.  Summary judgment is DENIED to Defendant on all other grounds.

**IT IS SO ORDERED.**

                                        s/ Michael R. Barrett
                                        Michael R. Barrett, Judge
                                        United States District Court